**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>vs.<br><br>ALBERTO MALDONADO-GUTIERREZ<br>and JUAN NEGRETE SANTANA,<br><br>   Defendants. | No. CR06-4054-DEO<br><br>**REPORT AND<br>RECOMMENDATION ON JOINT<br>MOTION TO SUPPRESS** |

_____

This matter is before the court on the defendants' joint motion (Doc. No. 16) to suppress evidence. The defendants filed their motion and a supporting brief (Doc. No. 17) on June 19, 2006. On June 26, 2006, the plaintiff (the "Government") resisted the motion (Doc. No. 18) Senior District Judge Donald E. O'Brien designated the undersigned to conduct a review of the evidence and to file a report and recommended disposition, in accordance with 28 U.S.C. § 636(b)(1)(B). Accordingly, the court held an evidentiary hearing on the motion on August 17, 2006, at which Assistant U.S. Attorney John Lammers appeared on behalf of the Government. The defendant Alberto Maldonado-Gutierrez ("Maldonado") appeared in person with his attorney, Assistant Federal Defender Robert Wichser. The defendant Juan Negrete Santana ("Negrete") appeared in person with his attorney, Jim K. McGough.

The Government offered the testimony of Iowa State Patrol Trooper Jason Halverson, and Monona County Sheriff's Deputy Troy Jeffrey Tadlock. Two exhibits were admitted into evidence, to-wit: Plaintiff's Ex. 1, a DVD containing video of the May 3, 2006, traffic stop involving the defendants; Plaintiff's Ex. 2, a copy of a teletype alert regarding a 1996 Chevrolet Blazer.

Subsequent to the hearing, the court ordered the Government to brief one of the issues raised in the motion which the Government had omitted from its brief. (*See* Doc. No. 26) On August *, 2006, the Government filed a brief, and on August *, 2006, the defendants filed a response.

The court has read the parties' briefs and considered the evidence presented at the hearing, and turns to consideration of the defendants' joint motion to suppress.

## *BACKGROUND FACTS*

On May 3, 2006, Trooper Halverson was on routine parol, working the 2:30 p.m. to 11:00 p.m. shift. At about 7:30 p.m., while he was patrolling Interstate 29 in the Monona, Iowa, area, he received a call from Dispatch to inquire whether he had received a copy of a teletype alert that had been transmitted earlier that day. Trooper Halverson had not received the alert, so Dispatch provided him with the information, which the Trooper wrote down on a piece of paper in his patrol car. The alert in question (Pl. Ex. 2) indicated law enforcement had received a report that a 1996 Chevrolet Blazer vehicle was traveling from Omaha, Nebraska, to Sioux City, Iowa, twice a week, and the vehicle was expected to be leaving Omaha sometime that day, on May 3rd. The vehicle was registered to an Alberto Lima with an Omaha address. The vehicle had a gold Chevrolet symbol on the back window, and the alert provided the vehicle's license plate number. The reporting person indicated the vehicle would be driven by "Albert Montendao aka Carlos Montendo-Lima," a subject about 5'5" tall with short hair, brown eyes, and little facial hair. The alert went on to indicate the subject was "known to transport loads of drugs." The alert advised law enforcement that if the vehicle was located, they should make their own case (i.e., there was no outstanding warrant or other existing grounds to stop the vehicle).

At approximately 8:00 p.m., Trooper Halverson received another call from Dispatch indicating the person who had provided the initial information had called law

2

enforcement again to report that the subject vehicle would be leaving Omaha in about half an hour. Trooper Halverson placed a call to Deputy Tadlock, who has a K-9 drug dog, and asked if Deputy Tadlock was on duty, telling him about the possibility that the subject vehicle might be traveling up from Omaha. Although Deputy Tadlock was not on duty, he advised Trooper Halverson to call him if he happened to stop the subject vehicle, and the deputy would bring his K-9 unit to the scene. Trooper Halverson continued to patrol I-29, while he watched for a vehicle matching the description provided in the alert. He was traveling southbound on I-29. At about 8:30 p.m., he saw a vehicle traveling northbound on I-29 that appeared to match the description of the subject vehicle. He activated his radar and clocked the vehicle going 77 mph in a 70 mph zone. In addition, as the vehicle passed him, he noticed it had very darkly-tinted windows that he suspected were in violation of the law.

Trooper Halverson crossed the center median of the highway, got into the northbound lanes, and caught up to the vehicle. He again checked the vehicle's speed with radar, clocking it at 74 mph. The vehicle moved into the right lane, and Trooper Halverson moved over behind it and activated his emergency lights to stop the vehicle. The vehicle pulled over and stopped. Trooper Halverson observed a driver and one passenger in the vehicle. He noted the vehicle matched every detail of the description in the alert, including the license plate number. He got out of his patrol car and approached the vehicle on the passenger side. He talked with the driver through the open passenger window, explaining why he had stopped the vehicle, and asking for the driver's license, registration, and insurance verification. The driver produced a Mexican driver's license bearing the name of Carlos Lima, which was one of the names listed in the alert. The driver also produced a registration for the vehicle, indicating it was registered to Alberto Lima, again matching the information in the alert. The trooper asked the passenger if he had any identification, and the passenger, later identified as the defendant Negrete,

3

produced an identification card from his wallet. Trooper Halverson noticed Negrete's hands were shaking badly, and he could see Negrete's heart beating rapidly underneath his T-shirt.

Trooper Halverson asked the driver, later identified as the defendant Maldonado, to come back to his patrol car while he wrote out the tickets. Maldonado sat in the front passenger seat of the patrol car and the trooper sat in the driver's seat. The patrol car, a 2004 Crown Victoria, was equipped with ordinary doors, in front and in back, that could be opened from both the inside and the outside, and Maldonado was not restrained in any way or locked in the vehicle. When both Maldonado and the trooper were in the vehicle, Trooper Halverson called Deputy Tadlock and asked him to come to the scene with his K-9 unit. The trooper then attempted to run a driver's license check and a check for outstanding warrants using the information on Maldonado's Mexican driver's license, but no information was available. Trooper Halverson then began entering information into the computer to generate traffic citations to Maldonado for speeding and failure to have a driver's license. While he was processing the tickets, Trooper Halverson engaged Maldonado in conversation about the nature of his trip.

Maldonado indicated he had lived in Omaha, Nebraska, for about five years. He stated he was going to Sioux City that evening to visit a friend who was in the hospital due to injuries received in a car accident. Maldonado did not know the friend's name, when the accident had occurred, the extent or nature of the friend's injuries, or the name of the hospital. He stated he was supposed to meet another friend at about 9:00 p.m. at a gas station in Sioux City, and then he would follow that friend to the hospital. Maldonado said Negrete was a friend of his who was riding along with him.

Trooper Halverson went back to the Blazer and used his tint meter to check the window tint. The windows tested at 13% light transmittal, which the trooper stated violates both Iowa and Nebraska law. The trooper returned to the patrol car to continue

processing the citations, including one for the window tint violation. While he worked, he continued to talk with Maldonado, explaining what he was doing with regard to the traffic citations, and asking about Maldonado's trip to Sioux City. Trooper Halverson stated Maldonado conversed with him in English at all times. Maldonado did not appear to have any trouble understanding the trooper. He responded appropriately to all of the trooper's questions, and the trooper had no difficulty understanding Maldonado's responses, which were given in English.

At some point while he was processing Maldonado's traffic citations, Trooper Halverson went back up to talk with Negrete. He wanted to get Negrete's date of birth so he could run a check for outstanding warrants. He asked Negrete his birth date in English, but Negrete indicated he did not speak much English. Trooper Halverson testified he can speak a little Spanish, enough that he can ask questions and understand most responses, so he began talking with Negrete in Spanish. Negrete provided his birth date. He said he had lived in Omaha for about eight months, and Maldonado was his first cousin. He stated he and Maldonado were going to Sioux City, where they planned to visit cousins for a couple of days. He did not know where the cousins lived, but he stated they had lived in Sioux City for awhile. During the conversation, Trooper Halverson observed that Negrete was extremely nervous. His heart was beating rapidly, and he had a card of a religious figure in his lap that he was fidgeting with. The trooper also noticed there were numerous air fresheners in the car, including some hanging from the steering column and others hanging from the rearview mirror.

Trooper Halverson returned to the patrol car and ran a warrants check on Negrete. He finished processing citations for the driver's license and window tint violations, and he had Maldonado either sign the computer screen, or Maldonado signed a piece of paper that was scanned into the computer. The trooper did not print out the tickets because he still had to process the ticket for the speeding violation. He indicated his practice is to wait

5

until he has completed all citations before he prints them out and provides copies to a subject. The trooper again asked Maldonado about his relationship with Negrete, and Maldonado again stated Negrete was just a friend.

The video indicates Trooper Halverson finished processing the tickets about twenty-three minutes after he initially stopped the Blazer. By this time, Deputy Tadlock had arrived at the scene. The deputy had come up to Trooper Halverson's patrol car to let the trooper know he had arrived, and then Deputy Tadlock returned to his own patrol car, parked behind the trooper's vehicle, where he awaited further instructions.

Trooper Halverson printed out the citations and gave copies to Maldonado. He explained the citations and what Maldonado should do with them. He asked Maldonado if he had anything illegal in his vehicle, specifically mentioning weapons, marijuana, cocaine, and methamphetamine. Maldonado said he had nothing illegal in the vehicle. Trooper Halverson asked Maldonado if he would mind if the officers searched the vehicle. Maldonado did not answer the question, but instead stated he needed to use the restroom. The trooper asked him twice more if they could search the vehicle, but Maldonado never answered the question. Trooper Halverson observed that Maldonado was fidgeting in his seat, appeared to be nervous, and would not make eye contact with him. The trooper took Maldonado's failure to answer the question as a refusal to consent to the search.

Trooper Halverson then told Maldonado that Deputy Tadlock had a drug dog, and he asked if Maldonado would mind if the deputy walked the dog around the vehicle. Maldonado consented to this. Deputy Tadlock explained to Maldonado that his K-9 unit was trained to detect drugs, and he asked if he could walk his dog around Maldonado's vehicle. Maldonado again consented. Prior to the drug dog being taken out of the deputy's vehicle, Maldonado was permitted to urinate in a roadside ditch.

For purposes of Negrete's safety and the officers' safety, Trooper Halverson asked Negrete to come back and sit in his patrol car while Deputy Tadlock walked the K-9 unit

6

around the vehicle. Negrete sat in the back seat of the trooper's patrol car. Trooper Halverson backed his patrol car up a few feet to allow room for the K-9 unit to inspect the vehicle. The trooper did not make any statements to Maldonado and Negrete to indicate they were not under arrest or were free to leave. However, by this point, the trooper testified he would have stopped the defendants if they had attempted to leave. Despite the fact that they had sought Maldonado's permission to take the K-9 unit around the car, Trooper Halverson believed he had probable cause for the K-9 inspection of the vehicle given his observations and the defendants' statements during the traffic stop.

Deputy Tadlock walked the K-9 unit up to inspect the vehicle. As Maldonado saw the dog, he uttered, "Dios mio," which is "My God" in English. Deputy Tadlock walked the K-9 unit around the vehicle three times. Each time, the dog alerted on the area of the driver's side headlight. On the third pass, the dog indicated on that area.[1] The officers told Maldonado that the dog had indicated on the headlight area, and Maldonado consented to a search of that area. Deputy Tadlock put the dog back into its kennel in the back of his car, and the two officers searched the headlight area, but found nothing. Deputy Tadlock then got the dog out again and put the dog inside the Blazer. The dog indicated on the center console and on a Crown Royal bag in the back seat. The deputy returned the dog to its kennel, and Negrete was moved to Deputy Tadlock's vehicle to wait while the officers searched the Blazer's interior. Maldonado remained in Trooper Halverson's vehicle. Underneath the Blazer's center console, the officer's found a quantity of methamphetamine. Nothing was found in the Crown Royal bag or in the bag seat. However, Deputy Tadlock testified that if drugs had been in that area, the dog would indicate on the area even if the drugs no longer were present.

---

[1] Deputy Tadlock explained an "alert" is when the dog takes a particular interest in an area, sniffing aggressively and sticking his nose into openings. An "indication" is an aggressive scratching that the dog is trained to do when it detects drug odor.

After the drugs were found, both of the defendants were placed under arrest. Trooper Halverson transported Maldonado to the Monona County Sheriff's office, while Deputy Tadlock transported Negrete. At the jail, Negrete was searched incident to his arrest, and a piece of foil containing some drugs was found on his person. Trooper Halverson called DEA agents, who came to the jail and interviewed the defendants. The trooper testified a DEA agent advised Negrete of his rights in Spanish and interviewed him in Spanish.

Notably, the entire traffic stop is recorded on the video, Plaintiff's Ex. 1, except for one to two minutes when Trooper Halverson had to change the videotape. He explained the time shown on the video is inaccurate due to a malfunction in the video recorder in his patrol car. He indicated the time difference is approximately forty minutes. From statements made by different individuals on the video, it appears the time shown on the videotape is about forty minutes behind the actual time.

The events as shown on the videotape support the officers' testimony about the sequence of events that occurred at the scene of the traffic stop.

## *DISCUSSION*

The defendants do not challenge the stop itself. Indeed, even if the stop was pretextual, the trooper could have stopped the vehicle for the most minor of traffic violations. *See United States v. Gomez Serena*, 368 F.3d 1037, 1041 (8th Cir. 2004) (citing *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996)); *United States v. Lyton*, 161 F.3d 1168, 1170 (8th Cir. 1998); *United States v. Caldwell*, 97 F.3d 1063, 1067 (8th Cir. 1996) (citing *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996)).

The defendants argue they were detained improperly after Trooper Halverson completed the traffic investigation and gave Maldonado the citations. They further argue

8

they were arrested without probable cause, and the warrantless search of the Blazer's interior was made without probable cause. The facts of the case do not support the defendants' arguments.

As the Eighth Circuit Court of Appeals explained in *United States v. Barragan*, 379 F.3d 524 (8th Cir. 2004):

> Once the stop of a vehicle has occurred, a "police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999); *see also United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003). "[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993). An officer may also question a vehicle's passengers to verify information provided by the driver, *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002), and conflicting stories may provide justification to expand the scope of the stop and detain the occupants. *Brown*, 345 F.3d at 578.

*Barragan*, 379 F.3d at 528-29.

In the present case, Trooper Halverson's suspicions were raised by the match of the Blazer and its driver to the details of the teletype alert, the obvious nervousness of the defendants, the presence of numerous air fresheners in the vehicle, and the discrepancies and incompleteness of the defendants' stories.

> An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered. *See United States v. Morgan,* 270 F.3d 625, 631 (8th Cir. 2001); *[United States v.] Poulack,* 236 F.3d [932,] 936 [(8th Cir. 2001)]. *See also [United States v.] Barahona,* 990 F.2d [412,] 416 [(8th

9

> Cir. 1993)] ("[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.").

*United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002).

Viewing the totality of the circumstances, the court finds Trooper Halverson was justified in detaining the defendants while he investigated further. In addition, with Deputy Tadlock's K-9 unit already at the scene before the traffic citations were completed, it was not a violation of the defendants' Fourth Amendment rights to require them to remain at the scene while the dog sniffed the vehicle's exterior. *See United States v. $404,905.00 in U.S. Currency*, 192 F.3d 643, 649 (8th Cir. 1999).

The defendants argue they were not merely detained during the K-9 sniff of the vehicle; they actually were under arrest because they were not free to leave. As noted above, Trooper Halverson was justified in detaining the defendants while he continued his investigation. The mere fact that the defendants were being detained in the officers' patrol cars did not mean they were under arrest, particularly in light of the short length of time the defendants were detained. *See Barragan, supra*; *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (citing *United States v. Naverrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)).

The defendants also argue Maldonado only consented to the officers' search of the area surrounding the driver's side headlight; he never consented to the K-9 unit sniffing the inside of the vehicle. In response, the Government agrees Maldonado never consented to a search of the vehicle, but the Government states the drug dog search of the vehicle's interior was not based on consent. The Government did not address the issue in its initial brief. (*See* Doc. No. 18, p. 4) In its subsequent brief, filed in response to the court's order, the Government argues the trooper had probable cause to search the vehicle in any event, and therefore the search lawfully could extend to "'every part of the vehicle and its

contents that may conceal the object of the search.'" (Doc. No. 27, p. 2, quoting *United States v. Ross*, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173, 72 L. Ed. 2d 572 (1982)); citing *United States v. Perry*, 925 F.2d 1077, 1080 (8th Cir. 1991)).

The defendants agree the trooper had probable cause to stop the vehicle and conduct a reasonable investigation. However, they argue probable cause did not exist for a search of the vehicle's interior. They note the K-9 unit had only been certified two days prior to the traffic stop, and the dog "acted in an excited and skittish manner throughout the duration of the traffic stop by acting nervously and alerting on the ditch of the roadway." (Doc. No. 30, p. 3)

The issue turns on whether the officers had probable cause to search any part of the vehicle. The Eighth Circuit explained the applicable law in *United States v. Perry*, 925 F.2d 1077 (8th Cir. 1991), as follows:

> In a prohibition vintage case, *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925), the Court, after reviewing the state of fourth amendment law to that date, announced that a search of an automobile could be conducted without a warrant where it was founded on probable cause to believe that contraband liquor was being carried. *Id.* at 155-56, 45 S. Ct. at 285-86. The case dealt with the transportation of bootleg whiskey in violation of prohibition and the federal laws enforcing it. A more modern pronouncement of the same reasoning is found in a narcotics case, *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982). There the search was conducted of the trunk of an automobile, including containers discovered therein, on the reasonable belief that heroin was being secreted. At issue was the scope of the search. While the High Court reiterated that warrantless searches are per se violative of the fourth amendment unless they fall within a carefully tailored exception, *id.* at 824-25, 102 S. Ct. at 2172-73 (quoting *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (citation omitted)), the Court concluded that the *Carroll* exception was such a carefully tailored exception into which the case fell.

11

> The Court further defined the exception as one that allows for a warrantless search whose scope is "no broader and no narrower than a magistrate could legitimately authorize by warrant." *Id*. 456 U.S. at 825, 102 S. Ct. at 2173. The Court held that ***"[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."*** *Id*.

*Perry*, 925 F.2d at 1080 (emphasis added). Thus, if the officers had probable cause to search any part of the vehicle, then they lawfully could search all parts of the vehicle that might contain drugs. *Id*.

In the present case, the undersigned finds the officers had probable cause to search the vehicle. Trooper Halverson cited numerous factors that, when taken together, provided reasonable suspicion that the defendants were transporting drugs. An unknown informant had provided information that a specific vehicle, with a specific license plate and description, frequently traveled to Sioux City, Iowa, from Omaha, Nebraska, with loads of drugs. The informant described the driver and provided a name used by the driver. The same informant stated the subject vehicle would be leaving Omaha that evening, headed for Sioux City.

Trooper Halverson saw a vehicle matching the informant's description perfectly. He lawfully stopped the vehicle for a traffic violation, and discovered that the driver also matched the informant's description. He observed that the driver and passenger were extremely nervous, and there were numerous air fresheners hanging in the vehicle. *Cf. United States v. Ojeda*, 23 F.3d 1473, 1476 (8th Cir. 1994) (strong masking odors in car contributed to jury's finding that defendant knew there were drugs in car). He also noted discrepancies in the stories the defendants gave with regard to their trip. While Maldonado referred to Negrete as a "friend," Negrete said Maldonado was his "cousin." Maldonado said he was traveling to Sioux City to visit a friend who was in the hospital, yet he could not provide the friend's name or the name of the hospital. Negrete said they were

traveling to Sioux City to visit cousins, but he could not provide an address for the cousins.

When the K-9 unit walked around the subject vehicle, the dog alerted twice and finally indicated on the vehicle, strongly evidencing the presence of drugs somewhere within the vehicle. The court does not find it dispositive that the dog indicated on the headlight area each time. Deputy Tadlock testified it was windy in the area, and each time a car passed on the highway, it tended to throw the dog off the scent somewhat, though the dog continued to alert to the presence of drugs. "A dog's identification of drugs in . . . a car provides probable cause that drugs are present." *United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994). The court finds it was unnecessary for the dog to alert to any particular place on the car to provide probable cause for a further search.

Given these facts, the court finds the officers had probable cause to search the vehicle. Had they applied for a search warrant based on these facts, a reasonable magistrate legitimately could have authorized a search of the entire vehicle. At the very least, the officers had probable cause to search the headlight area of the vehicle. Pursuant to *Ross*, they therefore had probable cause to conduct a warrantless search of every area of the vehicle that could conceal drugs. Further, the officers did not simply begin to search the entirety of the vehicle. Instead, they took the K-9 unit into the vehicle. It was only when the dog alerted to the vehicle's console that they searched that area, locating the drugs. The court finds the officers acted reasonably, lawfully, and within the *Carroll*/*Ross* automobile exception to the fourth amendment prohibition of warrantless searches.

One final matter should be noted. In its resistance to the defendants' joint motion, the Government also raises the issue that Negrete lacks standing to challenge the search of the Blazer. Because the court has found the search to be valid in any event, the issue is moot and requires no further discussion here.

Accordingly, for the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED** that the defendants' joint motion to suppress evidence be denied in its entirety. Objections must be filed by **August 29, 2006**. Responses to objections, if any, must be filed by **September 1, 2006**.

**IMPORTANT NOTE:** Any party planning to lodge objections to this Report and Recommendation must order a transcript of the hearing promptly (**in any event not later than Monday, August 28, 2006**), <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>. If an attorney files an objection to this Report and Recommendation without having ordered the transcript as required, then the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 22nd day of August, 2006.

*/s/ Paul A. Zoss*

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT